UNITED STATES DISTRICT COURT  Feb 21 2020

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| IN THE MATTER OF THE APPLICATION OF THE UNITED STATES OF AMERICA FOR AN ORDER AUTHORIZING THE SEARCH OF: 2440 SENTRY DRIVE UNIT A101, ANCHORAGE, ALASKA, HEREIN **TARGET RESIDENCE** | ) ) ) CASE# 3:20-MJ-00086-MMS ) ) ) ) |

## AFFIDAVIT IN SUPPORT OF APPLICATION

I, Britt L Damon, being first duly sworn, hereby depose and state as follows:

### AGENT'S BACKGROUND

1) This affidavit is being submitted in support of an application for a search warrant for the following premises:

    a. **2440 Sentry Drive Unit A101, Anchorage, Alaska (TARGET RESIDENCE)**.

2) As such, it does not include all the information known to me as part of this investigation, but only information sufficient to establish probable cause for the requested search warrant. The location and items to be searched are described herein and in Attachment A, and the items to be seized are described herein and in Attachment B.

3) I am a Special Agent employed by the United States Drug Enforcement Administration (DEA) currently assigned to the Anchorage District Office. I have been employed by the DEA since

1

January of 2012. Prior to employment with the DEA, I served as a Military Police Officer in the United States Army. During the course of my employment as a Law Enforcement Officer, I have gained experience in conducting drug investigations and have received the benefit of many years of such experience of fellow agents and officers. During the course of your Affiant's employment with the DEA, your Affiant has worked in an undercover capacity and conducted investigations of controlled substances violations in conjunction with agents and officers from other jurisdictions. Your Affiant has worked with and conducted investigations utilizing confidential sources. Your Affiant has also conducted or assisted in investigations which have led to the arrest and conviction of persons for violations dealing with the sale, possession and/or manufacture of cocaine, methamphetamine, heroin, fentanyl, MDMA, LSD, psilocybin, marijuana and other controlled substances, money laundering and the seizure and forfeiture of assets. As part of these investigations, your Affiant has been able to interview arrested subjects and their associates. Through these interviews, your Affiant has learned how and why these offenders conduct various aspects of their drug trafficking activities, to include communicating, manufacturing, packaging, distribution, transportation and concealment of controlled substances and assets and money laundering.

4) Based upon my experience, training, and information I have received from officers of other federal, state, and local law enforcement agencies involved in the investigation of controlled substance offenses and proceeds derived from the illegal possession and sale of controlled substances, I know that individuals involved in the illegal distribution of illegal controlled substances have the following characteristics in common:

    a.    That drug dealers very often place assets, including accounts at financial institutions, in names other than their own to avoid detection by government or other law enforcement agencies.



b.  That even though these assets are in other names, the drug dealers continue to use these assets and exercise dominion and control over them.

c.  That drug dealers frequently maintain on-hand amounts of United States currency in order to maintain and finance their ongoing illegal drug business.

d.  That drug dealers often maintain books, records, receipts, notes, ledgers, computers, computer disks, tickets, money orders, cashier's checks, wire transfer receipts, and similar drug related financial documents and records pertaining to the transportation, ordering, sale and distribution of illegal drugs. Furthermore such documents are often written in code.

e.  That drug dealers commonly front (provide illegal drugs on consignment) to their clients and often keep the aforementioned items so they can account for their drugs, the money owed for these drugs, and who has or owes for these drugs.

f.  That the aforementioned books, records, receipts, notes, ledgers, tickets, money orders, cashier's checks, and similar financial documents and records, including computers, computer disks, diskettes, and hard drives, and other media are maintained where the drug dealers have ready access to them. Often the described records and documents are maintained on computers and electronic media in the drug trafficker's home.

g.  That it is common for drug dealers to conceal contraband, large amounts of currency, precious metals, jewelry, address lists, telephone lists, proceeds of drug sales, and records of drug transactions in secure locations within their residences, yards, garages, offices, businesses, automobiles, safes, safe deposit boxes, and obscure locations known only to them, i.e., mail drops, mini storage warehouses, etc., for ready access and to conceal the same from law enforcement authorities.

h.  That persons involved in illegal drug trafficking conceal in their residences, yards, offices, businesses, safes, garages, storage buildings, vehicles, safe deposit boxes, and obscure locations, caches of drugs, large amounts of currency, weapons, financial instruments, precious metals, jewelry, and other items of value and/or proceeds from drug transactions and evidence of financial transactions relating to obtaining, transferring, secreting, or spending of money made from engaging in illegal drug trafficking activities. Also, drug dealers frequently change vehicles and register vehicles in other names to avoid detection by law enforcement personnel.

i.  That drug dealers often purchase expensive vehicles, businesses and residences with the proceeds from their drug transactions. Also, that drug dealers frequently change vehicles and register vehicles in other names to avoid detection by law enforcement personnel.

j.  That drug dealers amass large proceeds from the sale of illegal drugs, they often attempt to legitimize their profits and maintain evidence of financial transactions relating to the obtaining, transferring, secreting or spending of large sums of money

3

derived from their illegal drug distribution activities. That to accomplish these goals, drug dealers utilize, including but not limited to, foreign and domestic banks and their attendant services, securities, cashier's checks, money drafts, letters of credit, brokerage houses, real estate, shell corporations, business fronts, telephones, cellular telephones, facsimile machines, digital and various paging devices, and two-way radio systems. Furthermore, drug dealers frequently change telephone numbers, paging devices and telephone instruments.

k. That drug dealers commonly maintain addresses and telephone numbers in books or papers which reflect names, alias names, addresses, and telephone numbers for their associates in their illegal drug trafficking.

l. That drug dealers take or cause to be taken photographs, video and audiotapes of themselves, their associates, their property, and their illegal products. Furthermore, these drug dealers often maintain these photographs, video and audiotapes in their residences, offices, safes, garages, storage buildings, vehicles and safe deposit boxes.

m. That drug dealers frequently keep paraphernalia for packaging, diluting, weighing, and distributing the illegal drugs. Furthermore, this paraphernalia includes, but is not limited to, scales, plastic bags, diluting or "cutting" agents, boxes, trash compactors, heat sealers, and sealing tape.

n. The courts have recognized that unexplained wealth is probative evidence of crimes motivated by greed, and in particular, illegal trafficking in controlled substances.

o. That drug traffickers very often possess firearms and other weapons for the purpose of protecting their drug trafficking enterprises from the efforts of law enforcement authorities as well as from persons who might attempt to steal any drugs or money possessed by the drug traffickers.

p. Affiant is aware that drug traffickers often maintain extra residences as stash houses, meeting locations, and temporary housing for drug associates. Furthermore, these residences are frequently rented, purchased or titled in others names even though the residences remain in the control of the drug traffickers.

## APPLICABLE STATUTES

5) The statutory provisions to which the current investigation relates include;

   a. Title 21, United States Code, Section 841 (a) (1) and 846, the Distribution of Controlled Substances, the Possession of Controlled Substances with Intent to Distribute, as well as the conspiracy to commit those violations.

 Feb 21 2020

    b. Title 18, United States Code, Section 1956, Laundering of Monetary Instruments

6) I am familiar with the provisions of these statutes and based upon my experience, I believe that the items described in this affidavit and which are sought with this search warrant are relevant and probative to the proof of violations of such sections of Title 21 and Title 18 as described herein.

## PURPOSE OF AFFIDAVIT

7) I have personally participated in the investigation set forth below. I am familiar with the facts and circumstances of the investigation through my personal participation, from discussions with other agents of the DEA and other law enforcement officers. Unless otherwise noted, wherever in this affidavit I assert that a statement was made, the information was provided by another law enforcement officer. Such statements are among many statements made by others and are stated in substance and in part unless otherwise indicated. In addition, this affidavit is based on information from the following sources:

    a.    Oral and written reports about this and other investigations which I have received from other local law enforcement officers;

    b.    Public records;

    c.    My training and experience as a Special Agent and the training and experience of other law enforcement officials.

8) Based on the facts set forth in this affidavit, there is probable cause to believe that the Target Location is being used to commit violations of 21 U.S.C.§ 841(a)(1) and § 846 and 18 USC § 1956. There is also probable cause to believe that the items to be seized described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of additional individuals who are engaged in the commission of these offenses. Your affiant further states that there is probable cause to believe that the items sought for seizure will lead to evidence of the aforementioned crimes as well as the identification of

5

 Feb 21 2020

individuals who are engaged in the commission of conspiracy to distribute controlled substances and related crimes.

9) Based on the facts set forth in this affidavit, there is probable cause to believe that **James LOVETTE and Ashley LOVETTE**, and others, known and unknown have violated 21 USC, Section 841 (a) (1) and 846 and 18 USC § 1956. There is also probable cause to believe that the premises described in Attachment A will contain items of evidence that will enable investigators to more fully identify the names, phone numbers, and residences of associates of LOVETTE, and others known and unknown; and to identify the dates, times, and places for commission of illegal activities, including locations of drug sales, details surrounding drug shipments, methods and means of drug transportation and smuggling, and methods and means of transporting and/or laundering drug proceeds.

## LOCATION TO BE SEARCHED

10) I submit this affidavit in support of an application for a search warrant for the residence located at **2440 Sentry Drive Unit A101, Anchorage, Alaska**, herein referred to as the **TARGET RESIDENCE**. The items sought in the search are more particularly set forth in Attachment B to this affidavit.

11) The **TARGET RESIDENCE** is described as **2440 Sentry Drive Unit A101, Anchorage, Alaska,** which is located near the intersection of Sentry Drive and Lake Otis Parkway in Anchorage, appearing to be a light brown colored 3 story apartment building (apartments with separate addresses). The apartment complex is a light brown with red trim multi-level building labeled "2440". The **TARGET RESIDENCE** is on the ground level at the southwest side of the building, adjacent to unit "102", and marked "101".


Feb 21 2020

## BASIS OF INVESTIGATION

12) In August of 2018, Anchorage Police Department (APD) provided your Affiant with information regarding the drug distribution activities of James Cornell LOVETTE. LOVETTE lived at the TARGET RESIDENCE at that time and citizens were complaining that there was a high volume of traffic to and from the TARGET RESIDENCE. Based on your Affiant's training and experience, I know this to be a common indicator of retail drug distribution. APD had previously contacted LOVETTE in May of 2018, for an unrelated matter, at the TARGET RESIDENCE. At that time, LOVETTE was driving a black Chevy Tahoe bearing Alaska license GYY879, which he usually parked in the lot outside the doors to his building. LOVETTE also provided phone number 907-764-2926 as his contact number at that time.

13) Around that same time, August of 2018, LOVETTE was observed associating with William WHITE, a known associate of the Little Souljah Crew gang. WHITE and LOVETTE had both been involved in a 2016 investigation into the shooting of another known drug trafficker in the Anchorage, AK area in 2015.

14) Pursuant to an administrative subpoena issued in November, 2018, DEA obtained subscriber information and tolls for LOVETTE's phone x2926. The subscriber information confirmed that LOVETTE is the subscriber of that phone (since 2011) and he lists the TARGET RESIDENCE as his home address. An analysis of LOVETTE's tolls indicated that LOVETTE was in contact with multiple known drug traffickers in the Anchorage area. In particular, LOVETTE was in contact with Giovanni CHIMERA, who was subsequently arrested in possession of a firearm during a controlled delivery of one kilogram of cocaine.

15) LOVETTE was also in telephonic contact with James POINDEXTER, who provided multi-

 Feb 21 2020

ounce quantities of methamphetamine to an ATF undercover agent in 2018. LOVETTE was also in telephonic contact with Christopher POINDEXTER, son of James POINDEXTER, who is also a known distributor of multiple pounds of methamphetamine and firearms in the Anchorage, AK area.

16) Open source records indicate that LOVETTE's wife is Ashley LOVETTE; she also resides at the TARGET RESIDENCE. Phone records and social media reveal that Ashley LOVETTE associates with POINDEXTER and other known drug traffickers in the Anchorage, AK area. On February 14, 2020, US Postal Inspector Andrew Grow advised that Ashley LOVETTE currently receives mail at 2440 Sentry Drive, Unit A101, Anchorage, AK.

17) On February 13, 2020, an ATF Undercover agent purchased ounce quantities of methamphetamine from Christopher POINDEXTER during two controlled purchases on the same day (117g and 58g of a clear crystal substance which tested positive for the presence of methamphetamine).

18) Prior to the first transaction, surveillance followed POINDEXTER's black Honda sedan bearing Alaska license FAC829 (occupied by POINDEXTER, his girlfriend Kira LINDMAN, and his associate Raymond CONLEY) to the Chevrolet dealership at 9100 Old Seward Highway, Anchorage, AK. At approximately 3:05pm, POINDEXTER was observed meeting with a large Black male adult wearing dark colored clothing at the Southeastern corner of the building by garage bay #4.

19) POINDEXTER then traveled to 2440 Sentry Drive, Anchorage, AK, where he alighted and ran through the snow covered back yard, to the back door of the lower level unit of the southwest side of building "2440" (the TARGET RESIDENCE), at approximately 3:15pm. LINDMAN turned the vehicle around and waited for POINDEXTER in the street with the

8

 Feb 21 2020

vehicle running. A few minutes later, POINDEXTER exited the back door of the unit and fidgeted with the door before returning to FAC829. POINDEXTER then travelled directly to the designated meeting location and provided 117 gross grams of suspected methamphetamine to the UC at approximately 3:30pm.

20) The UC then coordinated for a second transaction and POINDEXTER returned to his residence at a separate location. Surveillance was maintained on POINDEXTER and a silver SUV dropped off a short stocky Black female with puffy hair in a ponytail (UF1). She got into a maroon Porsche Cayenne SUV with black rims, which had also just arrived. Then, UF1 went into POINDEXTER's residence, at approximately 4:49pm. Several minutes later, POINDEXTER left his residence in FAC829, met the UC at the designated meeting location, and provided an additional 58 gross grams of methamphetamine. POINDEXTER then returned to his residence at approximately 4:57pm, and UF1 exited the Porsche SUV and entered POINDEXTER's residence as well.

21) At approximately 5:08pm, POINDEXTER, UF1 and CONLEY left the residence in FAC829. UF1 drove, with POINDEXTER and CONLEY as the passengers. The vehicle drove back to the same Chevrolet dealership and, at approximately 5:32pm, parked in the same area, in front of garage bay #4. POINDEXTER exited the vehicle and walked into the southern-most door of the building; but quickly exited, while a tall, bearded, heavy-set, light-skinned Black male, wearing dark clothing (later identified from DL photo as James LOVETTE) exited a door on the east side of the building. LOVETTE walked to POINDEXTER's vehicle where LOVETTE, POINDEXTER, and UF1 met. POINDEXTER appeared to have a small item in his right hand and he shook hands with LOVETTE. LOVETTE then kept his right hand closed and held it to his chest before looking at his hand

9

and putting it down toward his pocket. POINDEXTER immediately returned to FAC829 and UF1 interacted with LOVETTE and then returned to FAC829, which departed at approximately 5:35pm.

22) Law enforcement then followed FAC829 to the area of Sentry Drive. They travelled there using the exact same route; however, the vehicle suddenly turned off at Colony Loop (a road just south of Sentry Drive) and pulled into a turnaround and driveway area. FAC829 sat still for a short time and then pulled out on to the street. The occupants of FAC829 were looking around suspiciously while pulling out of the turnaround. The vehicle then turned onto Independence Drive and left at a high rate of speed.

23) Your Affiant believes, based on my training and experience, the behavior exhibited by POINDEXTER and his associates is indicative of counter surveillance tactics employed by drug traffickers for the purpose of identifying the presence of law enforcement surveillance. Further, the sudden turns before leaving the area at a high rate of speed indicate behavior consistent with criminals who are alerted to the presence of law enforcement surveillance.

24) On February 19, 2020, your Affiant observed GYY879 (LOVETTE's black Chevy Tahoe) parked outside the TARGET RESIDENCE. Also noted were fresh foot tracks through the snow leading from Sentry Drive (where LINDMAN had staged the vehicle as described above) to the back door of the TARGET RESIDENCE. The foot tracks indicated recent additional foot traffic to the door because a significant amount of snow had fallen the previous day and night.

25) On February 20, 2020, at approximately 2:49pm, law enforcement observed LOVETTE exit the front door to the TARGET RESIDENCE apartment building, enter GYY879, and travel to the South Anchorage Chevy dealership.

 Feb 21 2020

26) Based on the information provided herein, I submit there is probable cause to search the **TARGET RESIDENCE** located at 2440 Sentry Drive Unit A101, Anchorage, AK.

Respectfully submitted,

Britt L. Damon, Special Agent
Drug Enforcement Administration

Subscribed and sworn to before me

on ___February 21, 2020___

UNITED STATES MAGISTRATE JUDGE